10 CV 4730 (BMC)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALBERT MAJORS IV,

Plaintiff,

-against-

CITY OF NEW YORK, ROBERT PUMILIA SHIELD
NO. 10574, BRIAN RODER, SHIELD NO. 27358, and
JOHN and JANE DOE 2 through 10, individually and in
their official capacities, (the names John and Jane Doe
being fictitious, as the true names are presently
unknown),

Defendants.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT PURSUANT
TO RULE 56

**Oral Argument Requested**

HARVIS & SALEEM LLP
*Attorneys for Plaintiff Albert Majors IV*
305 Broadway, 14th Floor
New York, N.Y. 10007

By: Afsaan Saleem
Tel:  (212) 323-6880

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

STANDARD OF REVIEW ................................................................................................... 3

ARGUMENT

    POINT I

          EVERY MATERIAL FACT IN THIS CASE IS GENUINELY DISPUTED, PRECLUDING SUMMARY JUDGMENT ..................................................................................4

          A.  Reasonable Suspicion and Probable Cause.........................................6

          B.  Failure to Intervene ........................................................................11

          C.  Qualified Immunity..........................................................................12

    POINT II

          RODER AND PUMILIA'S PERSONAL INVOLVEMENT IS UNDISPUTED.......................................................15

    POINT III

          PLAINTIFF STATES A CLAIM AS TO THE CITY'S QUOTA POLICY PURSUANT TO MONELL AND ITS PROGENY..................................................................................16

          A.  The Pleading Requirement for a *Monell* Claim is Plausibility ........................................................................................20

          B.  Plaintiff States a *Monell* Claim as to the Quota Policy.......................23

CONCLUSION...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Amnesty Am. v. Town of W. Hartford*
361 F.3d 113 (2d Cir. 2004)...................................................................................24

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986)..................................3, 5, 6, 10, 12, 16

*Babi-Ali v. City of New York*
979 F.Supp. 268 (S.D.N.Y. 1997) ..........................................................................24

*Bd of County Comm'rs of Bryan County, Okla. v. Brown*
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed. 2d 626 (1997)......................................24

*Bell Atl. Corp. v. Twombley*
550 U.S. 544 (2007).................................................................................................23

*Binder & Binder PC v. Barnhart*
481 F.3d 141 (2d Cir. 2007)......................................................................................4

*Bryant v. City of New York*
022011/2007 (Kings Sup. Ct. 2011) .......................................................................20

*Celotex Corp. v. Catrett*
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)............................................3

*City of Oklahoma City v. Tuttle*
471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed. 2d 791 (1985)..........................................21

*Colon v. City of New York*
60 N.Y.2d 78, 468 N.Y.S.2d 453 (1983) ..............................................................6, 7

*Colon v. City of New York*
09-CV-8, 09-CV-9 (JBW), 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009)...........22

*Colon-Rodriguez v. New York City Dep't of Correction*
07-CV-8126 (GBD), 2009 WL 995181 (S.D.N.Y. April 13, 2009) ......................21

*Cornejo v. Bell*
04-CV-341 (BMC), 2008 WL 5743934 (E.D.N.Y.  May 19, 2008) ..............3, 4, 12

*Curry v. City of Syracuse*
316 F.3d 324 (2d Cir. 2003)......................................................................................6

*Devenpeck v. Alford*
543 U.S. 146, 125 S.Ct. 588, 160 L.Ed. 2d 537 (2004)......................................................6, 9

*Douglas v. City of New York*
595 F.Supp. 2d 333 (S.D.N.Y. 2009) ...............................................................................13, 16

*Droz v. McCadden*
580 F.3d 106 (2d Cir. 2009)...................................................................................................13

*Dwares v. City of New York*
985 F.2d 94 (2d Cir. 1993).....................................................................................................21

*Gashi v. County of Westchester*
02-CV-6934 (GBD), 2005 WL 195517 (S.D.N.Y. Jan. 27, 2005) .........................................22

*Hall v. Marshall*
479 F.Supp. 2d 304 (E.D.N.Y. 2007) ....................................................................................24

*Hargroves v. City of New York*
2011 WL 605816 (2d Cir. 2011).............................................................................................6

*Harlow v. Fitzgerald*
457 U.S. 800 (1982)...............................................................................................................13

*Hartry v. County of Suffolk*
08-CV-3725 (ADS) (ETP), 2010 WL 5128368 (E.D.N.Y. Dec. 15, 2010) .............................4

*Haywood v. Bureau of Immigration & Customs Enforcement*
372 Fed. Appx. 122 (2nd Cir. 2010) .......................................................................................2

*Holeman v. City of New London*
425 F.3d 184 (2d Cir. 2005)....................................................................................................6

*In re Daniel B.*
2 A.D.3d 440, 768 N.Y.S.2d 230 (2nd Dept. 2003)..................................................................7

*In re James C.*
23 A.D.3d 262, 805 N.Y.S.2d 13 (1st Dept. 2005)....................................................................7

*In the Matter of P.B.A. and City of New York*
Case No. A-10699-04 ........................................................................................................17, 18

*Javid v. Scott*
913 F.Supp. 223 (S.D.N.Y. 1996) ..........................................................................................21

*Jean-Laurent v. Wilkinson*
    540 F.Supp. 2d 501 (S.D.N.Y. 2008) ...............................................................11

*Jenkins v. City of New York*
    478 F.3d 76 (2d Cir. 2007)..............................................................................13

*Kent v. Katz*
    312 F.3d 568 (2d Cir. 2002)...............................................................................6

*Kerman v. City of New York*
    261 F.3d 229 (2d Cir. 2001)..............................................................................14

*Kimbrough v. Town of Dewitt Police Dep't*
    08-CV-03 (GLS), 2010 WL 3724121 (N.D.N.Y. March 8, 2010) ..........................20

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*
    507 U.S. 163 (1993)....................................................................................20, 21

*Martinez v. Simonetti*
    202 F.3d 625 (2d Cir. 2000)....................................................................5, 12, 14

*Matter of Paul N.*
    244 A.D.2d 489, 664 N.Y.S.2d 341 (2nd Dept. 1997)............................................7

*McLaurin v. Falcone*
    2007 WL 247728 (2d Cir. 2007)........................................................................14

*Monell v. Dep't of Soc. Servs.*
    436 U.S. 658, 690-91 (1978) ..................................................................... passim

*Nesbitt v. County of Nassau*
    05-CV-5513, 2006 WL 3511377 (E.D.N.Y. Dec. 6, 2006)....................................24

*Nimkoff v. Dollhausen*
    --- F.Supp. 2d ---, 2010 WL 4678711 (E.D.N.Y. 2010) ........................................21

*O'Neill v. Krzeminski*
    839 F.2d 9 (2d Cir. 1988).............................................................................11, 12

*Pearson v. Callahan*
    555 U.S. 223, 129 S.Ct. 808 (2009).....................................................................13

*Pembaur v. City of Cincinnati*
    475 U.S. 469 (1986)....................................................................................23, 24

*People v. Basch*
325 N.E.2d 156 (1975)................................................................................7

*People v. Darling*
801 N.Y.S.2d 779 (N.Y. App. Term 2005)...................................................9

*People v. James*
902 N.Y.S.2d 293 (N.Y. Crim. Ct. April 12, 2010)......................................7

*People v. Outlar*
677 N.Y.S.2d 430 (N.Y. Crim. Ct. 1998) ...................................................7

*People v. Quinones*
No. 01-371, 2002 N.Y. Slip Op. 50091(U) (N.Y. App. Term Mar. 5, 2002)...........................9

*People v. Siton*
906 N.Y.S.2d 703 (N.Y. Crim. Ct. July 29, 2010) .....................................10

*People v. Weatherspoon*
23 Misc.3d 1139(A) (N.Y. Crim. Ct. May 5, 2009) ...................................10

*Phelps v. City of New York*
04 Civ. 8570 (DLC), 2006 WL 1749528 (S.D.N.Y. June 27, 2006)................9, 11, 16

*Rheingold v. Harrison Town Police Dep't*
568 F.Supp. 2d 384 (S.D.N.Y. 2008) .......................................................20

*Robison v. Via*
821 F.2d 913 (2d Cir. 1987).....................................................................14

*Saucier v. Katz*
533 U.S. 194 (2001).................................................................................13

*Schoolcraft v. City of New York*
10-CV-6005 (RWS) (S.D.N.Y. 2010) .........................................................19

*Simpkins v. Bellevue Hosp.*
832 F.Supp. 69 (S.D.N.Y. 1993) ..............................................................20

*Smith v. City of New York*
04-CV-3286 (TPG), 2010 WL 3397683 (S.D.N.Y. August 27, 2010)...................21

*Terry v. Ohio*
392 U.S. 1, 88 S.Ct. 1868 (1968).............................................................8

*Tsotesi v. Bd. of Educ.*
258 F.Supp. 2d 336 (S.D.N.Y. 2003) ...................................................................22

*United States v. Colon*
250 F.3d 130 (2d Cir. 2001)....................................................................10, 11

*United States v. Lee*
916 F.2d 814 (2d Cir. 1990)......................................................................8

*United States v. Lopez*
321 Fed. App. 65 (2d Cir. 2009) ................................................................9

*United States v. Sokolow*
490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed. 2d 1 (1989)....................................8

*United States v. Valez*
796 F.2d 24 (2d Cir. 1986)......................................................................10

*Walczyk v. Rio*
496 F.3d 139 (2d Cir. 2007)......................................................................5

*Weyant v. Okst*
101 F.3d 845, 852 (2d Cir. 1996)..............................................................5

*Wheat v. New York City Dep't of Correction*
10-CV-5459 (SAS), 2010 WL 5129065 (S.D.N.Y. Dec. 15, 2010) ......................................22

*Whren v. United States*
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed. 2d 89 (1996)..................................6

*Woods v. Goord*
01-CV-3255 (SAS), 2002 WL 731691 (S.D.N.Y. April 23, 2002) ........................................5

*Zahra v. Town of Southold*
48 F.3d 674 (2d Cir. 1995)......................................................................5

*Zellner v. Summerlin*
494 F.3d 344 (2d Cir. 2007)........................................................13, 14, 15

**Statutes**
Fed. R. Civ. P. 56(c) ............................................................................3

Fed. R. Civ. P. 56(f)..............................................................................16

N.Y. Labor Law § 215-a ......................................................................17, 18

N.Y. Penal Law § 140.10 ............................................................................7, 9, 10, 15

N.Y. Penal Law § 140.15 ............................................................................10


**Periodicals**

James Fanelli, *Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas
For Moving Violations, Memos Say*, N.Y. DAILY NEWS, November 8, 2010 ........................20

Rocco Parascandola, *Irate Cops at 79th Precinct in Bedford-Stuyvesant Threaten Boycott
Over Quotas*, N.Y. DAILY NEWS, December 12, 2010 ....................................................18, 19

Rocco Parascandola, *Deputy Chief Michael Marino Threatens Cops at 79th Precinct
Who Want To Go On Summons Strike*, N.Y. DAILY NEWS, December 15, 2010 ...................19

Rocco Parascandola and Joe Jackson, *High Ranking Brooklyn Cop in Quota Storm
Getting Shipped to Staten Island*, N.Y. DAILY NEWS, December 24, 2010 ...........................19

Graham Rayman, *The NYPD Tapes: Inside Bed-Stuy's 81st*, THE VILLAGE VOICE, May 4,
2010 .......................................................................................................................19

Oren Yaniv, *Court Rules That Cops Do Use Quotas; Woman Injured In 2006 Arrest
Settles For $75,000*, N.Y. DAILY NEWS, February 19, 2011 .................................................20

**Websites**

http://www.nyc.gov/html/nypd/html/crime_prevention /anti_graffiti_coordinators.shtml
(accessed Mar. 9, 2011) ..............................................................................................17

http://www.nyc.gov/html/nypd/html/housing_bureau/psa2.shtml
(accessed Mar. 15, 2011) ............................................................................................17

Plaintiff Albert Majors IV ("Plaintiff" or "Mr. Majors"), by his attorneys, Harvis & Saleem LLP, respectfully submits this Memorandum of Law in opposition to Defendants' City of New York, Robert Pumilia and Brian Roder's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On the evening of June 18, 2010, Mr. Majors entered 284 Sutter Avenue in Brooklyn, New York ("284 Sutter") with Isaiah Stewart, his friend and tenant of the building's third floor.  Declaration of Afsaan Saleem ("Saleem Decl."), Deposition of Albert Majors, Exhibit ("Ex.") 1, pp. 118-122.  At approximately 1:30 a.m. on June 19, 2010, Mr. Majors received a telephone call from his girlfriend and stepped out of Mr. Stewart's apartment and into the stairwell to speak with her.  Saleem Decl., Ex. 1, p. 135.  There are two sides and two stairwells inside of 284 Sutter; as Mr. Majors stepped into the "B" stairwell on the third floor to place his phone call, approximately 10 people were playing dice on the fourth floor landing of the "A" stairwell and in the fourth floor "A" hallway.  Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("56.1 Statement"), ¶¶ 5, 6, 8, 10, 13, 14.

Unbeknownst to Mr. Majors, an anonymous call had been placed to 911 to report gambling on the fourth floor of 284 Sutter, and officers were notified by radio of a "10-10" – police code for a possible crime.  Declaration of Leo Dorfman ("Dorfman Decl."), Sprint Report, Ex. E; Saleem Decl., Deposition of Brian Roder, Ex. 2, p. 75.  As Mr. Majors spoke to his girlfriend he observed a police officer running up the "A" staircase and saw the gamblers rush into an apartment on the fourth floor.  Saleem Decl., Ex. 1, p. 142.  Mr. Majors ended his call and headed back toward Mr. Stewart's apartment when a uniformed police officer "grabbed" him and another blocked his path.  Saleem Decl., Ex. 1, p. 146.  The officers accused Mr. Majors of gambling and Mr. Majors explained that he had not been gambling and had friends in the

building.  Saleem Decl., Ex. 1, p. 155.  Mr. Majors cell phone rang and when he reached to answer it, he was handcuffed.  Saleem Decl., Ex. 1, p. 155.

Promising release, the officers then asked Mr. Majors to knock on the door of the apartment into which the gamblers had run, in an apparent effort to pursue its occupants.  Saleem Decl., Ex. 1, p. 159.  When Mr. Majors refused to knock, the officers arrested him for criminal trespass, in spite of his statement to them that he had a friend in the building and without asking him for his friend's name or apartment number or otherwise making any effort to confirm his lawful presence in the building.  Saleem Decl., Ex. 1, pp. 152, 159, 179-180.  After Mr. Majors was placed in a police vehicle, Mr. Stewart approached and the officers told him "we [are] taking your friend in for criminal trespassing."  Saleem Decl., Ex. 1, p. 174-175.  Mr. Majors was taken to a police precinct for several hours, issued a Desk Appearance Ticket and released.  56.1 Statement, ¶¶ 85, 88.

There is a dispute between the parties as to the identities of the officers who stopped, detained and arrested Mr. Majors.  For the purposes of this opposition, Plaintiff accepts the sworn testimony of defendants Pumilia and Roder that they were the first and only officers to respond to the "10-10" as well as defense counsels' representations to the Court that no other officers were present during or involved in his detention or arrest.  Saleem Decl., Ex. 3, p. 186; Ex. 2, pp. 84-85.  *See Haywood v. Bureau of Immigration & Customs Enforcement*, 372 Fed. App. 122, 124, (2d Cir. 2010) (litigants are "generally bound by the admissions of retained counsel").

Defendants move to dismiss pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff's false arrest claim fails because there was probable cause for his arrest; (2) Officers Roder and Pumilia were not personally involved in Plaintiff's

arrest; (3) the individual defendants are entitled to qualified immunity; (4) probable cause for Plaintiff's arrest bars his failure to intervene claim; and (5) Plaintiff fails to state a *Monell* claim. Plaintiff opposes Defendants' motion on each ground as set forth herein.

## STATEMENT OF FACTS

For a full and complete statement of facts, Plaintiff respectfully refers the Court to Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts.

## STANDARD OF REVIEW

It is well-settled that summary judgment under FED. R. CIV. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" within the meaning of FED. R. CIV. P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Cornejo v. Bell*, 04-CV-341 (BMC), 2008 WL 5743934, *7 (E.D.N.Y. May 19, 2008) (internal quotation and citation omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party has met its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Hartry v. County of*

*Suffolk*, 08-CV-3725 (ADS) (ETP), 2010 WL 5128368, *4  (E.D.N.Y. Dec. 15, 2010) (internal citations and quotations omitted).  "[I]f there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Cornejo*, 2008 WL 5743934 at *7 (citing *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation omitted)).

## ARGUMENT

### POINT I

#### EVERY MATERIAL FACT IN THIS CASE IS GENUINELY DISPUTED, PRECLUDING SUMMARY JUDGMENT

In their motion, Defendants purport to adopt Plaintiff's narrative.  Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs. Mem."), p. 1. However, Defendants neglect to mention that each and every material fact alleged by Plaintiff is directly contradicted by Defendants' own sworn testimony and official paperwork.  Further, in arguing their motion Defendants have improperly drawn all inferences in *their own* favor.  *See, e.g.,* Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("56.1 Response"), ¶¶ 12, 28-29, 48-49, 57, 74; Defs. Mem., pp. 1, 6-8, 10, 13-14 ("when asked what his business was in the building, plaintiff provided only *very vague and sketchy information…*") (emphasis added).

Viewed in a light most favorable to him, Plaintiff alleges that officers stopped him pretextually and arrested him for trespass when they had no reason to believe he had committed any crime and without conducting any investigation.  Indeed, Plaintiff asserts that the officers arrested him in retaliation for his refusal to participate in their gambling investigation. Saleem Decl., Ex. 1, p. 159 ("Hey, man, you – you want to be a smart guy, you going to jail for criminal trespassing.").  If a jury credits Plaintiff's version of the events, it could easily determine that he

suffered a violation of his Fourth Amendment rights.   Under such circumstances, summary judgment is inappropriate. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

Similarly, a favorable light reveals that plaintiff has alleged an unlawful arrest lacking both actual and arguable probable cause, a clearly established Constitutional violation. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("Without a doubt, the right not to be arrested without probable cause is clearly established.").   As a jury must decide the facts and make the credibility determinations critical to the legal analysis of probable cause (and failure to intervene), qualified immunity cannot shield the officers at the summary judgment phase.   *See Walczyk v. Rio*, 496 F.3d 139, 166-67 (2d Cir. 2007) (Sotomayor, J., concurring); *see also Woods v. Goord*, 01-CV-3255 (SAS), 2002 WL 731691, at *10 (S.D.N.Y. April 23, 2002).

Put simply, since Mr. Majors' allegation is that the officers who unlawfully stopped him did not conduct a sufficient trespass investigation by, *inter alia*, failing to ascertain specific information about his purpose in the building (i.e. who he was visiting, if his purpose was lawful), and Defendants do not (and cannot) argue that there was reason to believe Plaintiff had committed any other crime.   As a result, neither Roder, Pumilia nor anyone else could have had probable cause, arguable probable cause or "collective knowledge" of information that would amount to arguable probable cause to justify his arrest.   Nor is there any evidence in the record that Roder and Pumilia reasonably relied on other officers' actions or a superior officer's instructions; indeed, their sworn testimony is that the decision to arrest was theirs alone.   As only a jury can resolve the parties' fundamental factual dispute as to the extent of the police investigation surrounding plaintiff's stop and arrest (and hence, the facts known to the NYPD and the Defendants), a trial must be conducted. *Anderson*, 477 U.S. at 248.   ("[S]ummary

judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## A.     Reasonable Suspicion and Probable Cause

In the Second Circuit, the warrantless arrest of an individual is presumptively unlawful.  *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003).  Defendants bear the burden of "raising and proving the affirmative defense of probable cause."  *Id.*  "Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (quoting *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).  "[T]he existence of probable cause is to be determined on the basis of the totality of the circumstances…through an inquiry into whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause or arguable probable cause to arrest."  *Hargroves v. City of New York*, 2011 WL 605816 (2d Cir. 2011) (citing *Kent v. Katz*, 312 F.3d 568, 576 (2d Cir. 2002) and *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

Being present in an "area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," although officers need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Holeman*, 425 F.3d at 190 (internal citation and quotation omitted).  Once officers have stopped an individual to investigate suspected criminal activity, the absence of probable cause may be inferred from their failure to conduct a reasonable investigation prior to arrest. *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 (1983) ("[T]he failure [of police] to make a

further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (internal citation omitted).

The case law in New York on the legal requirements of public housing trespass arrests pursuant to N.Y. Penal Law § 140.10(e) ("§ 140.10(e)") – Mr. Majors' sole arrest charge – is well developed.  A police officer lacks probable cause to make a trespass arrest where a suspect declines to voluntarily offer details regarding his or her presence in the common area of a public housing building.  *In re Daniel B.*, 2 A.D.3d 440, 441, 768 N.Y.S.2d 230, 231 (2nd Dept. 2003) (no probable cause where suspect told officer he was "just hanging out" and did not offer an explanation for his presence); *In re James C.*, 23 A.D.3d 262, 805 N.Y.S.2d 13 (1st Dept. 2005) (same); *see also Matter of Paul N.*, 244 A.D.2d 489, 664 N.Y.S.2d 341 (2nd Dept. 1997) (trespass charge legally insufficient where suspect ran into apartment and residents exclaimed "[w]hat are you doing in my house?").

To arrest for trespass, police officers must have probable cause to believe that the suspect "was knowingly present where he was not welcome."  *People v. James*, 902 N.Y.S.2d 293, 295 (N.Y. Crim.Ct. April 12, 2010) (citing *People v. Outlar*, 677 N.Y.S.2d 430 (N.Y. Crim. 1998)).  Furthermore, a person who trespasses upon premises "accidentally, or who honestly believes" that he or she is licensed or privileged to enter or remain is not guilty of trespass. *People v. Basch,* 325 N.E.2d 156 (1975).

Here, Plaintiff claims that the entirety of the police investigation into his alleged criminal trespass consisted of the questions "you live in this building?" and "[w]hat are you doing in this building?," to which Plaintiff responded that he did not live in the building but was friends with a tenant, the visitation of whom would be an indisputably lawful purpose.  Saleem Decl., Ex. 1, pp. 152, 159, 179-180.  The officers never asked plaintiff whom he was visiting.

Saleem Decl., Ex. 1, p. 180.  While the probable cause inquiry is objective, it is nevertheless telling that defendants conceded at their depositions that plaintiff could not be arrested if he responded as he claims.  Saleem Decl., Ex. 2, p. 96 ("If he said he had friends in the building, I would say that he can go to his friend's house."); Ex. 3, p. 132 ("[Trespass suspects] are not obliged to tell me the name [of the person they are visiting], but if they refuse to leave – they can choose to leave the building, sorry.").

Indeed, the facts known to the officers as plaintiff alleges them fail as a matter of law to establish even reasonable suspicion for his initial pre-arrest seizure and detention, which by his account was forceful and clearly nonconsensual.  Saleem Decl., Ex. 1, p. 146; *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).  The officers who "grabbed" plaintiff knew that (1) a group of ten or more people suspected of playing dice had, upon the officers' arrival, fled from the fourth floor landing of the "A" staircase into an apartment on the "B" side of the building, going through two closed doors; Saleem Decl., Ex. 1, pp. 140-143; and (2) plaintiff, who was alone, was first observed standing up from his seat on the "B" staircase between the third and fourth floors.  Saleem Decl., Ex. 1, pp. 137, 146.

Even assuming that these facts justified a "consensual encounter," to ask plaintiff if he had been gambling and to provide identification, *see, e.g., Lee*, 916 F.2d at 819, the officers lacked a reasonable individualized basis to physically seize plaintiff as he alleges they did. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (Fourth Amendment seizure requires "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'") (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884 (1968)). "A valid *Terry* stop must be justified at its inception, and there must be a particularized and objective basis for suspicion of legal wrongdoing under the totality of the circumstances." *United*

*States v. Lopez,* 321 Fed. App. 65, 67 (2d Cir. 2009) (internal quotation marks and citation omitted).

Defendants, who bear the burden of establishing the existence of probable cause, cite two trespass cases (neither of which concern public housing) in support of their argument: *People v. Darling*, 801 N.Y.S.2d 779 (N.Y. App. Term 2005) and *People v. Quinones*, 01-371, 2002 N.Y. Slip Op. 50091(U) (N.Y. App. Term Mar. 5, 2002). However, both of these cases are easily distinguishable for the same fundamental reason – the suspects were asked questions about their presence that they could not verifiably answer. *Id.* Plaintiff, on the contrary, answered every question he was asked with information that, had it been verified, would clearly have established his lawful presence in the building. Saleem Decl., Ex. 1, pp. 152, 159, 179-180.

Additionally, Defendants have failed to submit *any* evidence that there were "conspicuously posted rules or regulations governing entry and use" of 284 Sutter that Plaintiff could have been knowingly violating, as required by § 140.10(e). *See Phelps v. City of New York*, 04 CIV. 8570 (DLC), 2006 WL 1749528 (S.D.N.Y. June 27, 2006) (summary judgment denied as to false arrest claim where officers failed to provide information regarding sign placement and content through affidavit in § 1983 public park trespass suit). Without any evidence whatsoever that conspicuously placed signs had informed Plaintiff that trespassing in the area where he was stopped was prohibited, Defendants can point to nothing "that would allow a fact-finder to determine that their actions were 'objectively reasonable'" and summary judgment should be denied. *Id.*, at *3; 56.1 Response, ¶ 12.

Nor was there probable cause to arrest Plaintiff for any other crime. *Devenpeck*, 543 U.S. at 153. Defendants concede this point by failing to argue that plaintiff could have been arrested for any crime other than trespass. *See* Def. Mem., generally. It bears noting that

9

plaintiff was also charged by the District Attorney with Trespass in the Second Degree, N.Y. Penal Law § 140.15 ("§ 140.15"), *see* Saleem Decl., Criminal Complaint, Ex. 4. However, § 140.15 is "not applicable to trespass in a public housing facility." *People v. Siton*, 906 N.Y.S.2d 703, 708-9 (N.Y. Crim.Ct. July 29, 2010) (holding that hallway of public housing project was not a "dwelling" as required by § 140.15); *see also People v. Weatherspoon*, 23 Misc.3d 1139(A), 2009 WL 1651507, *2 (N.Y. Crim. Ct. May 5,2009) (§ 140.15 may not be charged for conduct violating § 140.10(a) through (f)).

Finally, Defendants' tortured "collective knowledge" argument fails at the outset. In this circuit, courts may look to the "collective knowledge" of the police force and impute that knowledge to the arresting officer in assessing probable cause because, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986). A "collective knowledge" argument requires a showing that *some officer(s)* on the force possessed knowledge of facts that would establish arguable probable cause. *Id.*; *see also United States v. Colon,* 250 F.3d 130, 135 (2d Cir. 2001). As set forth *supra*, Defendants have fallen far short of establishing arguable probable cause and a jury could easily determine facts material to the analysis in Plaintiff's favor, precluding summary judgment. *Anderson*, 477 U.S. at 248.

Furthermore, notwithstanding their purported adoption of plaintiff's narrative, the defendants have testified under oath and prepared documents under the penalty of perjury stating that their probable cause to arrest plaintiff was derived exclusively from their own investigation. Saleem Decl., Ex. 3, p. 186; Ex. 2, p. 84-85; Ex. 4. The defendants cannot escape liability for an arrest they effected in the absence of arguable probable cause on the basis of a conversation that

they swear never occurred with phantom officers they claim do not exist, facts that, if true, would mean they had repeatedly perjured themselves, falsified their paperwork and lied to this Court. *See Phelps*, 2006 WL 1749528 at *3; Point II, *infra*.

In any event, such a conversation could not shield Pumilia and Roder from liability here because the first two officers lacked arguable probable cause themselves and there is no evidence that Pumilia or Roder had any reason to believe the first officers possessed probable cause. Indeed, the only person who has testified to any interaction between Roder, Pumilia and the first two officers, Plaintiff, testified that the first officers said only one thing to them: "who wants the collar?" Saleem Decl., Ex. 1, pp. 168-169; *Colon,* 250 F.3d at 135.

Accordingly, Defendants have failed to meet their burden to rebut the presumption that their seizure and warrantless arrest of Plaintiff was unlawful and summary judgment as to Plaintiff's unlawful stop and false arrest claims should be denied.

## B.     Failure to Intervene

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir 1988) (collecting cases). Liability attaches if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson,* 540 F.Supp. 2d 501, 512 (S.D.N.Y.2008) (citing *O'Neill*, 839 F.2d at 11-12). The evidence clearly establishes fundamental questions of fact as to the individual Defendants' liability on Plaintiff's failure to intervene claim, precluding summary judgment.

First, Officer Roder admits that he heard Officer Pumilia's questions to Plaintiff and was paying attention to Plaintiff's answers.  Saleem Decl., Ex. 2, pp. 90, 94.  Thus, Roder was present and it cannot be disputed that he had a realistic opportunity to intervene, assuming such intervention was warranted.  *Jean-Laurent*, 540 F.Supp. 2d at 512.  Second, assuming, as Plaintiff alleges, that the facts known to Pumilia and Roder (or any police officer) were insufficient to establish arguable probable cause, a reasonable officer would know that by his stop and arrest Plaintiff's rights were being violated.  *Martinez*, 202 F.3d at 634 (it is "without a doubt" that the right not to be arrested without probable cause was clearly established at the time of Plaintiff's arrest).  Third, it is undisputed that Roder took no steps to intervene and prevent Plaintiff's false arrest.  Saleem Decl., Ex. 2, pp. 90, 94.  Thus, if a jury determines that Officer Pumilia lacked arguable probable cause when he arrested Mr. Majors for trespass, Officer Roder could be and likely would be found liable for failing to intervene.  *Anderson*, 477 U.S. at 248; *O'Neill*, 839 F.2d at 11.

Defendants' only argument against Plaintiff's failure to intervene claim is that they possessed at least arguable probable cause to arrest Mr. Majors.  *See* Def. Mem. at 16-17.  As explained at Point I(A), herein and *infra*, there are genuine disputes as to the material facts relevant to the legal determination of arguable probable cause.  Thus, if a jury credits Plaintiff's version of events and finds that the police lacked knowledge of facts sufficient to establish arguable probable cause, Roder can be liable on a failure to intervene theory and summary judgment should be denied.  *Cornejo*, 2008 WL 5743934 at *7.

## C.    Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   In *Saucier v. Katz*, the Supreme Court established a two-step procedure for evaluating qualified immunity. *Katz*, 533 U.S. 194, 201 (2001).   The threshold consideration is whether the plaintiff's allegations, if true, establish a constitutional violation.[1]   *Id*.   For the purposes of the qualified immunity analysis, officers must establish "[a]rguable probable cause," which exists when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007)) (emphasis in original).

However, "[a]rguable probable cause must not be misunderstood to mean almost probable cause." *Zellner*, 494 F.3d at 369 (quoting *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir. 2007)) (internal quotation marks omitted).   "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of New York,* 478 F.3d at 87.

"Defendants are not entitled to summary judgment if *any* reasonable trier of fact could find that the defendants' actions were objectively unreasonable." *Douglas v. City of New York*, 595 F.Supp. 2d 333, 341 (S.D.N.Y. 2009) (internal quotation omitted) (emphasis added). Where there are disputes as to material facts relevant to the qualified immunity analysis, it is reversible error to grant qualified immunity to a defendant on summary judgment. *McLaurin v.*

---

[1] In *Pearson v. Callahan*, the Supreme Court held that lower courts have discretion with respect to the order in which to review the two steps of qualified immunity analysis.  555 U.S. 223, 129 S. Ct. 808 (2009) (holding that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory).

*Falcone*, 2007 WL 247728, *1 (2d Cir. 2007) (citing *Kerman v. City of New York,* 261 F.3d 229, 239 (2d Cir. 2001) and *Robison v. Via,* 821 F.2d 913, 924 (2d Cir. 1987)) ("Because there are disputes of fact here as to whether McLaurin resisted arrest and whether the level of force used by the officers was necessary and reasonable, the District Court's grant of qualified immunity was premature.").

The facts here are similar to those in *Zellner*, where the Second Circuit reversed the district court's grant of judgment as a matter of law to defendants on the basis of qualified immunity for a warrantless disorderly conduct arrest of Zellner.  Here, as in *Zellner*, deciding qualified immunity would require the Court to invade the province of the jury to make findings of fact and determine credibility.  This is so because the parties present two entirely different versions of what happened.  If a jury believes Pumilia and Roder, it will find that the officers conducted a trespass investigation of Plaintiff by the book and that Plaintiff provided them with clear probable cause to believe he was trespassing.  In that situation, Plaintiff would not have suffered a Constitutional deprivation, and there would be no need for qualified immunity.

On the contrary, if Plaintiff is believed, the jury will find that officers including Pumilia and Roder intentionally arrested Plaintiff *knowing* that he had committed no crime – in retaliation for his refusal to abet their botched gambling investigation – and then proceeded to repeatedly perjure themselves and falsify sworn police paperwork.  Since plaintiff's version of the events includes disputed facts that, if credited, would show the intentional deprivation of a well-established Constitutional right of which a reasonable officer would have known, *see, e.g., Martinez*, 202 F.3d at 634, reasonable officers could never disagree as to the lawfulness of such conduct and qualified immunity is unavailable at this stage.  *See Zellner*, 494 F.3d at 374 ("[Since] the jury was not compelled - and hence the court was not permitted - to find that

14

Zellner had made some downward movement on his own… there was nothing for defendants to interpret in a way that gave them even arguable probable cause."). Therefore, summary judgment on qualified immunity grounds should be denied.

## POINT II

### PUMILIA AND RODER'S PERSONAL INVOLVEMENT IS UNDISPUTED

The defendants' sworn testimony and police paperwork (and expected trial testimony) maintains that: (1) Officers Pumilia and Roder were the first and only police officers who responded to the "10-10" at 284 Sutter, stopped Mr. Majors and arrested him, Saleem Decl., Ex. 3, p. 186, Ex. 2, pp. 84 - 85, 110-111; (2) The only fact the officers considered before deciding to stop Mr. Majors was that the officers believed him to be "there" at "the location [of the suspected gambling]," Saleem Decl., Ex. 2, p. 87;  (3) Although they were the only officers responding to a call about gambling in the building, the officers stopped one person, Mr. Majors, and asked him no questions about gambling, Saleem Decl., Ex. 2, pp. 88-89, 110-111, 163-164; (4) Instead, as Officer Roder listened, Officer Pumilia asked Mr. Majors if he was an invited guest and Mr. Majors said he was "not visiting anyone," Saleem Decl., Ex. 11, City7; Ex. 2, pp. 90, 94, Ex. 3, p. 199; (6) Officer Pumilia asked Mr. Majors why he was in the building and Mr. Majors did not respond, Saleem Decl., Ex. 11, City7; Ex. 3, p. 199; (7) Officer Pumilia then asked Mr. Majors to leave the building, an option both officers believe must be afforded an individual prior to arresting them for violating § 140.10(e) in a NYCHA hallway, Saleem Decl., Ex. 3, p. 201; Ex. 2, pp. 99, Ex. 11, City7; (8) After being asked to leave, Mr. Majors did and said "nothing" for an unknown period of time at which point the officers handcuffed and arrested him.  Saleem Decl., Ex. 3, pp. 201-203.

15

Based on Defendants Roder and Pumilia's sworn version of the events described above, viewed even, *arguendo*, in a light most favorable to them, it cannot be disputed that these officers were involved in Mr. Majors' arrest.  Moreover, the *Phelps* case, cited by Defendants, is of no help to them here.  In *Phelps*, the material facts regarding the involvement and roles of the various officers were undisputed.  *Phelps*, 2006 WL 1749528 at *3.  Indeed, in *Phelps* the officer who effected the arrest claimed to have "relied on the statements" of other officers and the *instructions of a commanding officer* to determine there was probable cause to make the arrest. *Id.*   The situation here is precisely the opposite as Roder and Pumilia swear that they acted entirely on their own, without speaking to or relying on any other officers before deciding to place Mr. Majors under arrest.  Saleem Decl., Ex. 3, p. 186; Ex. 2, pp. 84 - 85, 110-111.  On these facts, it would be impossible for a reasonable jury to determine that Pumilia and Roder were not personally involved in plaintiff's arrest and summary judgment should be denied. *Anderson*, 477 U.S. at 248.

## POINT III

### PLAINTIFF STATES A CLAIM AS TO THE CITY'S QUOTA POLICY PURSUANT TO *MONELL* AND ITS PROGENY

Pursuant to the Court's order dated December 14, 2010, Plaintiff's *Monell* claim against the City of New York ("City") was severed from his claims against Defendants Pumilia and Roder.  *See* Docket Entry Dated December 14, 2011.  Accordingly, Plaintiff has conducted no discovery as to the *Monell* allegations in the Amended Complaint.  Confronted with the same situation and procedural posture in *Douglas*, the Honorable Denny Chin found summary judgment (couched, as here, as a motion for dismissal) on the plaintiff's *Monell* allegations to be "premature," and it is respectfully submitted that summary judgment as to Plaintiff's *Monell* claim here is likewise premature.  *See Douglas*, 595 F.Supp.2d at 347; FED. R. CIV. P. 56(f).

16

To the extent the Court wishes to consider the merits of Plaintiff's *Monell* allegations, for the purposes of deciding this motion, in addition to the facts set forth in the Amended Complaint, Plaintiff respectfully requests, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the following facts derived from newspaper articles and publicly filed court documents relevant to Plaintiff's *Monell* claim:[2]

(1)     By virtue of civil litigation, media exposés, internal memoranda and reports, officer statements and departmental admissions, the NYPD has been shown to maintain a *de facto* arrest and summons quota policy, particularly in the precincts encompassing "Patrol Borough Brooklyn North," which includes "PSA" 2, where the arrest of Mr. Majors occurred ("quota policy").[3] The primary architect of this policy is former Patrol Borough Brooklyn North Deputy Chief Michael Marino ("Deputy Chief Marino").  Mr. Majors' arrest supports the inference that the quota policy was a moving force behind the Constitutional injuries he suffered.

(2)     In 2006, the NYPD was found to be in violation of New York State Labor Law Section 215-a, which makes it illegal to issue poor evaluations for an officer's failure to meet the requirement of an established summons quota.  *See In the Matter of P.B.A. and City of New York*, Case No. A-10699-04.

(3)     The *P.B.A.* decision was based on Police Officer David Velez's appeal of his 2005 performance evaluation from the 75th Precinct, which was based entirely on his failure to meet the minimum summons requirement.  *Id.*

(4)     In *P.B.A.*, Officer Velez presented evidence that the then-Commanding Officer of the 75th Precinct, Deputy Chief Michael Marino, who, upon information and belief, was at the time of Mr. Majors' arrest the Deputy Chief of Patrol Borough Brooklyn North, an area which includes "PSA" 2 and the location of Plaintiff's arrest, issued a directive that officers must meet "a quota of ten (10) summons per month" and "that the police officers in squad A-1 received lower marks on their evaluations if the officers did not meet 'this minimum requirement.'"  *Id.* at 9.

(5)     Additionally, Deputy Chief Marino reduced this directive to writing and distributed it to all of the supervisors in the 75th Precinct.  *Id.*

---

[2] Should Plaintiff's claims survive the instant motion, he will seek Defendants' consent or, if necessary, leave of Court, to file an Amended Complaint containing these facts prior to the commencement of the *Monell* phase of this litigation.

[3] The Brooklyn North Patrol Borough includes the 73rd, 75th, 77th, 79th, 81st, 83rd, 84th, 88th, 90th and 94th Precincts, "PSA" 2 and "PSA" 3. *See* http://www.nyc.gov/html/nypd/html/crime_prevention /anti_graffiti_coordinators.shtml (accessed Mar. 9, 2011).  "PSA" 2 patrols housing projects within the "confines of the 73rd, 75th and 77th Precincts." *See* http://www.nyc.gov/html/nypd/html/housing_bureau/psa2.shtml (accessed Mar. 15, 2011).

(6)     This written directive ordered that supervising officers were required to evaluate officers based on their adherence to the minimum quota of summonses and arrests.  *Id.*

(7)     As a result of Deputy Chief Marino's directive, Sergeant Lurch issued a memo to all officers in the 75th Precinct "remind[ing] [officers] that a failure to write the required amount of summonses and failure to make the required number of arrest[s] for each rating period will result in substandard performance ratings." *Id.* at 10.

(8)     The aforementioned memo was entitled "Squad Activity Expectations," and the word "activity" in that memo was specifically referring to the requisite number of summonses and arrests needed to meet the quota.

(9)     While defendants denied the existence of any quota, the arbitrator emphatically rejected defendants' claims:

> The Arbitrator finds that C.O. Marino's writing and Sergeant Lurch's Memo *could not have been clearer*: "failure to write the required amount of summonses … will result in substandard performance ratings …" Further, the asterisk in the goal column makes it clear that [these] "goals" are monthly, quarterly and yearly.  The Arbitrator is *completely persuaded* that the "goals" column on this memo meets the definition in Labor Law Section 215-a for "quota" … [Thus], the New York Police Department violated New York State Labor Law Section 215-a by establishing and maintaining a summons quota…

> *Id.* at 11, 27 (emphasis added).

(10)    Notwithstanding this finding, the chief perpetrator of this unlawful policy, Michael Marino, was subsequently promoted by the NYPD to Deputy Chief of Patrol Borough Brooklyn North, in charge of supervising the part of the borough in which "PSA" 2 is located.

(11)    In this role, Deputy Chief Marino oversaw the implementation of a policy within his Patrol Borough whereby officers who failed to achieve a specific monthly quota of summonses and arrests were punished.  Officers who challenged this unlawful policy were – often by Deputy Chief Marino personally – threatened, intimidated and, in at least one case, involuntarily committed to Jamaica Hospital for six days.

(12)    In or about October 2010 – four months after Mr. Majors' arrest – officers at the 79th Precinct protested the quota policy by refusing to write any summonses during one shift.  *See* Rocco Parascandola, *Irate Cops at 79th Precinct in Bedford-*

18

*Stuyvesant Threaten Boycott Over Quotas*, N.Y. DAILY NEWS, December 12, 2010 ("December 12th article,"); Saleem Decl., Ex. *5*.

(13)     The December 12th article reported that "[c]ops at the [79th Precinct], like those in other commands, insist their supervisors impose quotas, which are illegal, to churn out revenue for the city and impress higher-ups."  The specific monthly quota at the 79th Precinct requires officers to achieve "11 arrests, four for felonies, plus 22 tickets for parking, 26 for moving violations and 2 C summonses." *Id.*

(14)     The day after the December 12th article was published, Deputy Chief Marino appeared at the 79th Precinct's "Roll Call" and vowed to transfer any officers who suspended summons writing for a 24 hour period to further protest quotas, as officers had threatened.  Marino warned the officers that he would personally "come down [to the 79th Precinct] and make sure [the officers] write [the summonses]."  *See* Rocco Parascandola, *Deputy Chief Michael Marino Threatens Cops at 79th Precinct Who Want To Go On Summons Strike*, N.Y. DAILY NEWS, December 15, 2010; Saleem Decl., Ex. 6.

(15)     Immediately following the *New York Daily News* series on Deputy Chief Marino's quota enforcement at the 79th Precinct, Marino was transferred to Staten Island.  *See* Rocco Parascandola and Joe Jackson, *High Ranking Brooklyn Cop in Quota Storm Getting Shipped to Staten Island*, N.Y. DAILY NEWS, December 24, 2010; Saleem Decl., Ex. 7.

(16)     On August 13, 2010, less than two months after Mr. Majors' arrest, the complaint was filed in *Adrian Schoolcraft v. City of New York, et al.*, 10-CV-6005 (RWS).  The plaintiff in *Schoolcraft*, a police officer assigned to the 81st Precinct – adjacent to the area encompassing "PSA" 2 – alleges that the defendants in that case, including Deputy Chief Marino personally, had him seized and involuntarily admitted to Jamaica Hospital's psychiatric ward in an effort to discredit his whistle-blowing campaign against the quota policy.  *See Adrian Schoolcraft v. City of New York, et al.,* 10-CV-6005 (RWS), Amended Complaint, ¶ 153.

(17)     Mr. Schoolcraft's unauthorized recordings inside the 81st Precinct between June 1, 2008 and October 31, 2009, confirm that the quota policy is widespread, systemic and unchecked.  *See* Graham Rayman, *The NYPD Tapes: Inside Bed-Stuy's 81st*, THE VILLAGE VOICE, May 4, 2010; Saleem Decl., Ex. 8.

(18)     In the recordings, on June 12, 2008, a lieutenant is heard explaining to 81st Precinct officers at roll call that "[Deputy Chief Marino] was in the other day.  He actually laid down a number.  He wants at least three seat belts, one cell phone, and 11 others.  All right, so if I was on patrol, I would be sure to get three seat belts, one cell phone, and 11 others." *Id.*

(19)     The *Village Voice* author concludes that, "from the tapes, it's not hard to imagine an officer desperately driving to the precinct, looking for someone smoking pot on a stoop or double-parking to fill some gap in their productivity." *Id.*

(20)    Written documents outlining specific quota expectations for moving violations at the 77th Precinct were published in the *New York Daily News* on November 8, 2010.  *See* James Fanelli, *Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say*, N.Y. DAILY NEWS, November 8, 2010; Saleem Decl., Ex. 9.

(21)    On February 18, 2011, a Kings County Supreme Court jury in the civil trial of *Bryant v. City of New York*, 022011/2007, found that "the police had a policy 'regarding the number of arrests officers were to make that violated [the] plaintiff's constitutional rights and contributed to her arrest.'"  The plaintiff in *Bryant* was also arrested in the Brooklyn North Patrol Borough – within the confines of the 81st Precinct in 2006 – when the Marino-led quota policy was initially promulgated.  *See* Oren Yaniv, *Court Rules That Cops Do Use Quotas; Woman Injured In 2006 Arrest Settles For $75,000*, N.Y. DAILY NEWS, February 19, 2011; Saleem Decl., Ex. 10.

The factual allegations in Plaintiff's Amended Complaint, along with the publicly available information detailed *supra*, are more than sufficient to satisfy the pleading requirements for a *Monell* claim against the City of New York, and the City's arguments to the contrary are unavailing.

**A.    The Pleading Requirement for a *Monell* Claim is Plausibility**

"The Supreme Court has made clear that there is no heightened pleading standard for *Monell* claims."  *Kimbrough v. Town of Dewitt Police Dept.*, 08-CV-03 (GLS), 2010 WL 3724121, 11 (N.D.N.Y. March 8, 2010) (internal citations omitted); *see also Rheingold v. Harrison Town Police Dept.*, 568 F.Supp.2d 384, 394 (S.D.N.Y. 2008).  Indeed, "[a] plaintiff is not required to 'state or establish exactly' in his complaint the policy by which he alleges the defendants violated his rights, nor is he required to plead more than a single instance of misconduct." *Simpkins v. Bellevue Hosp.*, 832 F.Supp. 69, 73 (S.D.N.Y. 1993) (quoting *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)).

Indeed, where proof of an underlying incident includes proof that "it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal

policymaker," a single incident of unconstitutional conduct can be sufficient to impose liability under *Monell*.  *Nimkoff v. Dollhausen*, ---F.Supp.2d----, 2010 WL 4678711, *10 (E.D.N.Y. 2010) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)) (internal quotation omitted).

Defendants base their argument for a heightened *Monell* pleading standard in part on the 1993 Second Circuit case of *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), which held that *Monell* allegations must contain facts sufficient to permit "at least circumstantial[]" inference of an unlawful municipal custom or policy.  *See* Defs. Mem. at 20-21. However, such reliance is misguided.  The Supreme Court's decision in *Leatherman* effectively overruled any additional pleading requirements for *Monell* claims that might have been imposed by *Dwares*.  *Javid v. Scott*, 913 F.Supp. 223, 230 (S.D.N.Y. 1996) ("[W]e believe that [the *Dwares Monell* pleading] standards are no longer appropriate, in light of" *Leatherman*.).

Several courts in this circuit "have interpreted *Leatherman* as adopting the Ninth Circuit rule that 'a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice.'"  *Smith v. City of New York*, 04-CV-3286 (TPG), 2010 WL 3397683, *17 (S.D.N.Y. August 27, 2010) (internal citations and quotations omitted) (collecting cases); *see also Colon-Rodriguez v. New York City Dept. of Correction*, 07-CV-8126 (GBD), 2009 WL 995181, *6 (S.D.N.Y. April 13, 2009) ("As the Supreme Court made plain in *Leatherman*, when a plaintiff seeks to plead municipal liability under a *Monell* theory, he may simply identify the basic link of the constitutional tort to municipal responsibility…").

In an arrest quota case similar to the instant one, *Colon v. City of New York*, the Honorable Jack B. Weinstein approvingly examined, in the context of a 12(b)(6) motion, the sufficiency of *Monell* allegations that the *Colon* plaintiffs' arrests resulted from a municipal policy of "arresting innocent persons in order to meet 'productivity goals' (i.e. arrest quotas)." *Colon v. City of New York*, 09-CV-8, 09-CV-9 (JBW), 2009 WL 4263362, *1 (E.D.N.Y. Nov. 25, 2009). In the decision denying defendants' motion, Judge Weinstein noted that:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Id.*, at *2. *See Gashi v. County of Westchester*, 02-CV-6934 (GBD), 2005 WL 195517 (S.D.N.Y. Jan. 27, 2005) ("[the plaintiff claims that his] mistreatment by corrections staff was pursuant to the customs and practices of the Westchester County Jail – very close to an allegation that his mistreatment was pursuant to customs and practices of the County itself, which even standing alone would likely be sufficient to survive a motion to dismiss.") (citing *Tsotesi v. Bd. of Educ.*, 258 F.Supp.2d 336, 337-338 & n.10 (S.D.N.Y. 2003); *see also Wheat v. New York City Dep't of Correction*, 10-CV-5459 (SAS), 2010 WL 5129065 (S.D.N.Y. Dec. 15, 2010) (denying motion to dismiss *Monell* claim based on the denial of shoes to *pro se* inmate plaintiff).

Thus, to survive a motion to dismiss, Plaintiff's *Monell* allegations need only contain facts sufficient to render plausible the claim that his constitutional deprivation resulted

from an unconstitutional municipal policy, practice or custom. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978)*; Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007).

**B.      Plaintiff States a *Monell* Claim as to the Quota Policy**

Plaintiff alleges, pursuant to *Monell*, that the City of New York, through its final policymaker Deputy Chief Marino, from 2006 through and including the time of Plaintiff's arrest in June of 2010, maintained an official, but largely unwritten, policy in its Brooklyn North Patrol Borough, requiring officers to meet a monthly arrest and summons quota to avoid substandard evaluations and other professional penalties. *Supra*, pp. 17-21. The quota, in turn, incentivized and rewarded stops conducted in the absence of reasonable suspicion and arrests in the absence of probable cause. *Id.* Plaintiff's arrest – within the Brooklyn North Patrol Borough while the quota policy was in effect and alleged to have been made without even arguable probable cause, in fact, with conscious disregard for his innocence – resulted from the quota policy and its perverse incentives. Dorfman Decl., Ex. A, ¶¶ 17-19, 31-35.

Any arguable lack of specificity in the articulation of the quota policy in the Amended Complaint, which was filed after Plaintiff's *Monell* claim had been severed, is cured in the twenty-one additional proposed paragraphs, *supra* at pp. 17-21, without the benefit of *any* municipal discovery or FED. R. CIV. P. 30(b)(6) testimony. Far from mere boilerplate, taken together with the allegations in the Amended Complaint, Plaintiff's allegations tend to support the inference that his unconstitutional arrest (Amended Complaint, ¶¶ 17-19) occurred pursuant to the quota policy, promulgated by Deputy Chief Marino, a municipal policymaker. *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-482 (1986).

Further, it is obvious that the quota policy, if proven to exist as Plaintiff alleges, would amount to a "deliberate choice" by Deputy Chief Marino on behalf of the City of New

York "to follow a course of action… made from among various alternatives…" as to how officers' arrest statistics were factored into their performance evaluations. *See Pembaur*, 475 U.S. at 483. By deliberately choosing to reward officers who achieved a target number of arrests, Marino created the perfect conditions for Plaintiff's false arrest on June 19, 2010. Thus, it is more than plausible that Marino's conduct as a municipal policymaker was the moving force behind the injuries plaintiff alleges. *See Bd. of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Courts in this circuit have repeatedly held that allegations similar to Plaintiff's are sufficient to survive motion practice at the pleading stage. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 130 n. 10 (2d Cir. 2004) ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the conduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation."); *Hall v. Marshall,* 479 F.Supp.2d 304, 316 (E.D.N.Y. 2007) (holding that plaintiff adequately alleged *Monell* liability based on claim that City had a practice, policy, and custom of failing to train its officials in preparing accurate presentence reports); *Nesbitt v. County of Nassau,* No. 05-CV-5513, 2006 WL 3511377, at *4 (E.D.N.Y. Dec. 6, 2006) (denying motion to dismiss where plaintiff merely alleged that there was "'an official policy of negligent supervision and training of law enforcement officials which rises to the level of deliberate indifference to the constitutional rights of those within its domain'" and that "'[h]igh level county officials have personally participated in the maintenance of this policy by their active inattention to or knowing acquiescence in misconduct by law enforcement personnel'" (alteration in original)); *Babi-Ali v. City of New York,* 979 F.Supp. 268, 274 (S.D.N.Y. 1997) (noting that plaintiff's allegations

regarding "a history of mishandling situations involving *Brady* material" were sufficient to state a *Monell* claim).

Accordingly, Defendants' motion to dismiss Plaintiff's *Monell* allegations should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         March 16, 2011

HARVIS & SALEEM LLP

Afsaan Saleem
305 Broadway, 14th Floor
New York, New York 10007
(212) 323-6880
asaleem@harvisandsaleem.com

*Attorneys for Plaintiff*