

THE CITY OF NEW YORK

# LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**Sumit Sud/ Philip DePaul**
*Assistant Corporation Counsel*
ssud@law.nyc.gov
(212) 788-1096
(212) 788-9776 (fax)

June 21, 2011

**BY E.C.F.**
Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:    Albert Majors IV v. City of New York et al.
        10 CV 4730 (BMC)

Judge Cogan:

        We are the Assistant Corporation Counsel assigned to the defense of the above referenced matter, and we respectfully submit this letter advance of tomorrow's oral argument on defendants' motion for judgment as a matter of law to outline our position for the Court.

        Plaintiff's claims against Officers Pumilia and Roder should not go to the jury. No matter how you slice the cake – and there are many ways to slice it given the confusing and conflicting case that plaintiff has presented – no reasonable jury could conclude that defendants violated plaintiff's civil rights inside 284 Sutter Avenue on June 19, 2010.  At oral argument on defendants' summary judgment motion, Your Honor found summary judgment inappropriate because the jury could take the parts of plaintiff's story that it believed and the parts of defendants' story that it believed and craft a theory of liability.  However, rather than adopt one of the theories which survived summary judgment – either Pumilia and Roder were the first officers on the scene and did not ask the right questions, <u>or</u>, they were not on the scene and fabricated paperwork – plaintiff will ask the jury to return a verdict in his favor by finding that Pumilia and Roder failed to re-investigate an arrest that already occurred.  Plaintiff's presentation at trial is factually muddled, on the wrong side of the case law, and precludes any reasonable determination of liability.  Accordingly, defendants respectfully request that the Court grant their motion for judgment as a matter of law.

**I.      Plaintiff's False Arrest Claim Fails As A Matter of Law**

        Under plaintiff's presentation of the case, Pumilia and Roder came upon an arrest that had already occurred.  By the time Pumilia and Roder appear in plaintiff's narrative, plaintiff had been told he would be "locked up" for trespass, he was in handcuffs, and he did not feel free

to leave.  See Relevant excerpts of the trial transcript, annexed hereto as Exhibit A, at p. 213:12-14; 246:16-21.  Opposing counsel's theory that plaintiff was not under arrest at this point, or that there was some bizarre "continuation" of the arrest once Pumilia and Roder arrived, see Ex. A, at p. 258:6-10; 259:1-8, is contrary to law, and plaintiff's insistence that he "did not believe" that he was under arrest, see Ex. A, at p. 213:9-20, is irrelevant.  It is well-established that, in determining the point of arrest, the question is whether a reasonable person would have thought he was free to leave, and further, that this determination depends on objective circumstances and not the subjective believe of the officer or citizen.  United States v. Falso, 293 Fed. Appx. 838, 839 (2d Cir. 2008); see also Stansbury v. California, 511 U.S. 318, 323 (1994) ("[D]etermination of custody depends on the objective circumstances . . . not on the subjective views harbored by either the interrogating officers or the persons being questioned").  No reasonable person, standing in handcuffs and flanked by two officers holding the key, would think that he was free to leave, and plaintiff himself subscribes to this interpretation of events.  It is similarly well-established that officers arriving to the scene of an arrest do not have an independent duty to ascertain probable cause.  Loria v. Gorman, 306 F.3d 1271, 1288 (2d Cir. 2002) ("Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful").  Accordingly, under plaintiff's presentation of the case, Pumilia and Roder came upon an effectuated arrest and had no duty to further investigate the basis for plaintiff's presence at 284 Sutter Avenue.

## II.    Plaintiff's Failure to Intervene Claim Fails As A Matter Of Law

Plaintiff's other theory of liability, failure to intervene, is similarly disjointed.  Plaintiff will ask the jury to find that Pumilia and Roder failed to intervene in a false arrest perpetrated by two officers who plaintiff cannot identify.  However, these officers are not simply "unidentified" – they are imaginary.  Plaintiff has provided no evidence of their existence, other than his own confused testimony.  Meanwhile, defendants have elicited evidence which conclusively demonstrates that, on the night of plaintiff's arrest, (a) no officer wearing a yarmulke was present at 284 Sutter, Ex. A, at p. 123:16-18, 158:11-17, 184:16-185:5; (b) the officers assigned to Post 150 were both female, Ex. A, at p. 185:6-187:5; (c) the officers assigned to Post 550 were a male and female, neither of which wear a yarmulke, Ex. A, at p. 186:23-187:3; 188:12-16; and (d) the only officers who responded to 284 Sutter Avenue were Pumilia and Roder, see generally, Defendant's Exhibit H (Sprint Report).  Defendants also take this opportunity remind Your Honor of the results of the investigation that Corporation Counsel conducted into presence of other officers to rule out this possible theory of liability.  The Court knows, and both parties know, that these officers simply do not exist.  The jury should not be afforded an opportunity to find Pumilia and Roder constitutionally obligated to prevent imaginary officers from effectuating an arrest.  That is an impossible and unfair standard.

However, even if these imaginary officers actually were present at 284 Sutter on the night of plaintiff's arrest, plaintiff still does not have a viable claim for failure to intervene.  The facts in the record are simply insufficient to support a finding of liability in this regard because, under plaintiff's version of events, there was no opportunity for either defendant to intervene.  In order for liability to attach on a failure to intervene claim, "there must have been a realistic opportunity to intervene to prevent the [constitutional violation] from occurring."  Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  Here, plaintiff had already been stopped,

questioned, and handcuffed for <u>five to ten minutes</u> by the time Pumilia and Roder even arrived to the scene. <u>See</u> Ex. A, p. 214:20-22. As a matter of law, defendants did not have sufficient opportunity to prevent plaintiff's arrest, <u>cf</u> <u>Williams v. City of Rome</u>, 08 CV 14 (DNH)(GJD), 2009 U.S. Dist. LEXIS 60266, at *3-4, 15 (N.D.N.Y July 15, 2009) (Granting summary judgment on claim for failure to intervene in arrest and use of force where defendant officer arrived late to the scene and observed the plaintiff in handcuffs), and as explained in Point I, <u>supra</u>, Pumilia and Roder were under no obligation to make an independent ascertainment of probable cause.

## III.    Conclusion

Plaintiff has presented an exceptionally weak case that cannot support a verdict in his favor. He has proceeded on a theory that Pumilia and Roder failed to re-investigate an arrest that already occurred, which has fatal legal flaws as explained above. Defendants, on the other hand, have proceeded on a theory that Pumilia arrested plaintiff and Roder was not involved, which is undisputed, and that plaintiff's arrest was supported by probable cause. The only avenue for a plaintiff's verdict is if the jury members, on their own initiative, concoct a version of events that neither party has presented and is unsupported by any evidence in the record. Accordingly, defendants respectfully request that the Court grant their motion for judgment as a matter of law.

We thank the Court for its consideration herein.

Respectfully submitted,

_____/s_____
Sumit Sud
Philip DePaul
Assistant Corporation Counsel

cc:    Afsaan Saleem, Esq. (by ECF)
       Gabriel Harvis, Esq.
       *Attorneys for Plaintiff*

# Exhibit A

PUMILIA - CROSS/SUD

1   photography equipment and the computer.

2   Q    Going back to your supporting deposition here, when did

3   you complete this document?

4        (Exhibit published to the jury.)

5   A    On the 19th.

6   Q    Officer, looking at Exhibit B, where did you first go

7   when you arrived at 284 Sutter Avenue?

8   A    The hallway of the fourth floor.

9   Q    Is that noted in the paperwork, sir?

10  A    Yes.

11  Q    What happened when you got to the fourth floor at 284

12  Sutter Avenue?

13  A    I encountered the plaintiff.

14  Q    That's Mr. Majors, correct?

15  A    Correct.

16  Q    Were there any other officers on the fourth floor when

17  you arrived aside from yourself and your partner?

18  A    No.

19  Q    Had there been other officers on 284 Sutter Avenue on the

20  fourth floor of 284 Sutter Avenue, would that be something you

21  noted in your memo book, Officer?

22       MR. SALEEM:  Objection.

23       THE COURT:  Sustained.

24  Q    What documents would have reflected the fact that other

25  officers were on the scene at 284 Sutter Avenue?

CHARLEANE M. HEADING, RMR, CRR, FCRR
Official Court Reporter

RODER/CROSS/DePAUL

```
1    A    No, I was not.

2    Q    Were you wearing a yarmulke on June 19th, 2010?

3    A    No, I was not.

4    Q    Have you ever worn a yarmulke?

5    A    No, I have not.

6    Q    Was your partner, Police Officer Pumilia, wearing a

7    yarmulke on June 18th and June 19th, 2010?

8    A    No, he was not.

9    Q    Have you ever seen him wear a yarmulke?

10   A    No, I have not.

11   Q    Were there any police officers wearing yarmulkes present

12   at 284 Sutter Avenue when you first encountered plaintiff?

13   A    No, there was not.

14   Q    And based on your recollection, were there any police

15   officers wearing yarmulkes present throughout the entire time

16   that you were with plaintiff on June 19th, 2010?

17   A    Not that I remember.

18   Q    So, you said earlier that your partner spoke with

19   plaintiff?

20   A    Correct.

21   Q    Did you speak with plaintiff at all?

22   A    No.

23   Q    Do you know what Police Officer Pumilia and plaintiff

24   were speaking about?

25   A    Just that he was asking him questions about what his
```

MARIE FOLEY, RMR, CRR

LUCIANO/DIRECT/SUD

1   book in evidence, did there come a time when you verified an

2   arrest made by Officer Pumilia?

3   A   Yes.

4   Q   And what time was that?

5   A   It was 1:37 a. m.

6   Q   Where was that arrest?

7   A   It was inside 284 Sutter Avenue.

8   Q   What was that arrest for?

9   A   Criminal trespass.

10  Q   What does it mean, Sergeant, to verify an arrest?

11  A   Basically means to do a investigation on the scene, to

12  determine if there is probable cause to make an arrest.

13  Q   And did you determine and did you conduct that

14  investigation on June 18th, 2000 -- sorry, June 19th, 2010?

15  A   Yes.

16  Q   I'm sorry.  Sergeant Luciano, are you aware of any Jewish

17  male officers who are New York City police officers employed

18  at PSA2?

19  A   Yes, I am.

20  Q   How many?

21  A   One.

22  Q   What is that officer's name?

23  A   Officer Goldblatt.

24  Q   Was officer Goldblatt working on the night of Friday,

25  June 18th, 2010, into the morning of Saturday, June 19th,

LUCIANO/DIRECT/SUD

1   2010?

2   A    No, he was not.

3   Q    How do you know that, officer -- Sergeant?

4   A    I know this because he had off Friday, Saturday nights

5   for religious purposes.

6   Q .  Sergeant Luciano, do you recall who had foot post 150 on

7   June 18th, 2010?

8   A    Not off the top of my head.  I'm going to have to check

9   the roll call.

10  Q    The role call would refresh your recollection.

11  A    Yes.

12         MR. SUD:  Your Honor, if I may I approach?

13         THE COURT:  You may.

14         MR. SALEEM:  May I see that document, Your Honor?

15         THE COURT:  Show it to counsel first, please.

16         MR. SUD:  (Handing.)

17         MR. SALEEM:  (Peruses document.)

18  BY MR. SUD:

19  Q    Showing you what's been marked as Defendant's Exhibit N

20  for identification.  Officer, take a look at that document,

21  and tell me when you're done reviewing it. (Handing.)

22  A    (Peruses document.)  Okay.  I'm done.

23  Q    Who had -- I'm sorry.  Who was assigned to post 150 on

24  Friday, June 18th, 2010, into the morning of Saturday,

25  June 19th, 2010?

LISA SCHMID, CCR, RMR

LUCIANO/DIRECT/SUD

1    A    That would be Officer Kan and Officer Russell.

2    Q    Do you know if Officer Kan is a male or female?

3    A    Female.

4    Q    Do you know if Officer Russell is a male or female?

5    A    Female.

6    Q    Going back just one moment, Officer, to the arrest you

7    verified for Sergeant Pumilia on June 18th, 2010, did you

8    determine there was probable cause for Officer Pumilia's

9    arrest.

10   A    Yes, I did.

11              MR. SUD:  Thank you.  No further questions.

12              THE COURT:  All right.  Cross-examination?

13                        CROSS-EXAMINATION

14   BY MR. SALEEM:

15   Q    Sergeant Luciano, how many posts were assigned to cover

16   the area of 284 Sutter Avenue on June 18th to June 19th, 2010?

17   A    May I check the role book?

18   Q    Sure.

19   A    (Peruses document.)  There were three posts, six

20   officers.

21   Q    What were those posts?

22   A    Post 150, 350 and 550.

23   Q    Who are were the officers assigned to post 550?

24   A    (Peruses document.)  Officer Tisdale and Officer Thomas.

25   Q    And is officer Tisdale a male or female?

LUCIANO/CROSS/SALEEM

1   A    Female.

2   Q    Is Officer Thomas a male or female?

3   A    Male.

4   Q    And do you know how many officers responded to the scene

5   of 284 Sutter Avenue at or about 1 a. m -- between 1 a. m. and

6       2 a. m. ?

7   A    No, I don't.

8   Q    That's because you don't have any independent

9   recollection of this the arrest of Mr. Majors, right?

10  A    That is correct.

11  Q    And there's know no way to know -- withdrawn.

12       And if officers respond to a location, they are

13  supposed to put out over the radio and inform dispatch, right?

14       MR. SUD:  Objection.  Your Honor.  Outside the scope

15  of direct.

16       THE COURT:  Overruled.

17  A    Not necessarily.

18  BY MR. SALEEM:

19  Q    So sometimes, they there are certain circumstances where

20  an officer could respond to the scene and dispatch is not

21  notified, right?

22       MR. SUD:  Objection.

23       THE COURT:  Overruled.

24  A    Yes.

25  BY MR. SALEEM:

LISA SCHMID, CCR, RMR

LUCIANO/CROSS/SALEEM

```
 1   Q    And if dispatch is not notified, the presence of those
 2   officers at the scene wouldn't be reflected on a Sprint
 3   report, right?
 4            MR. SUD:  Objection.
 5            THE COURT:  Overruled.
 6   A    That's correct.
 7            MR. SALEEM:  Nothing further.
 8            MR. SUD:  Your Honor, just one final question.
 9            THE COURT:  Sure.
10            REDIRECT EXAMINATION
11   BY EUFPLT:
12   Q    Sergeant Luciano, you stated that post 550 was assigned
13   to POs Tisdale.  Does PO Tisdale wear a yarmulke?
14   A    No.
15   Q    Does PO Thomas wear a yarmulke?
16   A    No.
17            MR. SUD:  Thank you.  No further questions.
18            THE COURT:  All right.  You may step down.  Thank
19   you, sir.
20            All right.  We will go back to plaintiffs' case.
21   Plaintiff may call its next witness.
22            MR. HARVIS:  We call the plaintiff, Your Honor,
23   Albert Majors.
24            THE COURT:  All right.
25            (Witness sworn.)
```

LISA SCHMID, CCR, RMR

MAJORS/DIRECT/HARVIS

1   A    Yes.

2   Q    What did they ask you?

3   A    Go upstairs and knock on your buddy's door on the fourth

4   floor, and we'll let you go.

5   Q    And did you agree to knock on their door upstairs?

6   A    No, I didn't.

7   Q    Why not?

8   A    Because I didn't want to snitch.

9   Q    And did the officers say anything to you after you told

10  them that you wouldn't go and knock on the door upstairs?

11  A    Yes, they did.

12  Q    What did they say?

13  A    They told me that I would be locked up for criminal

14  trespassing, since I wanted to be a wise guy.

15  Q    Did you respond to that?

16  A    Yes, I did.

17  Q    What did you say?

18  A    No one is trespassing.

19  Q    At that point, did you think you were under arrest?

20  A    No, I didn't.

21  Q    Why not?

22  A    I thought the officer was pulling my strings, and I

23  didn't think you could get arrested for trespassing.

24  Q    What did you think could happen for trespassing?

25  A    I think you could get a ticket.

LISA SCHMID, CCR, RMR

MAJORS/DIRECT/HARVIS

1   Q    What do you mean when you say a ticket?

2   A    A summons.

3   Q    Is that something you would get right there at the scene?

4   A    Yes, it is.

5   Q    Did you expect that the handcuffs were going to be taken

6   off at some point?

7   A    Yes, I did.

8   Q    How long did you expect to be in handcuffs?

9   A    Not long.

10   Q    What did the officers do after you told them that

11   nobody's trespassing?

12   A    After I told them nobody was trespassing, they got on

13   their radios.

14   Q    And what happened after the officers got on the radios?

15   A    After the officers got on their radios, two other

16   officers showed up on the scene.

17   Q    Are the two officers who showed up on the scene the

18   defendants in this case?

19   A    Yes, it is.

20   Q    And how long were you waiting with those first two

21   officers before Officers Pumilia and Roder arrived?

22   A    I would say about five or ten minute.

23   Q    Did you have any other conversation with those first two

24   officers before the defendants arrived?

25   A    No, I didn't.

LISA SCHMID, CCR, RMR

MAJORS/CROSS/DePAUL

```
1    A    No, I wasn't.
2    Q    So, then one of the officers who first approached you,
3    the officer wearing the yarmulke, he went on his police radio;
4    isn't that correct?
5    A    Yes, it is.
6    Q    And then two other officers arrived in the hallway,
7    right?
8    A    Correct.
9    Q    And those officers were Officer Pumilia and Roder, right?
10   A    Yes, it is.
11   Q    So, we can agree that you were under arrest when Officers
12   Pumilia and Roder arrived, correct?
13            MR. HARVIS:  Objection.
14            THE COURT:  Overruled.
15   A    Not true.
16   Q    Well, Mr. Majors, you just testified that you weren't
17   free to leave, correct?
18   A    I wasn't free to leave.
19   Q    And you were also in handcuffs?
20   A    I was in handcuffs.
21   Q    You didn't have the keys to the handcuffs, did you?
22            MR. HARVIS:  Objection.
23            THE COURT:  Overruled.
24   A    No.
25   Q    And, as you testified on your direct, you didn't exchange
```

MARIE FOLEY, RMR, CRR

MAJORS/CROSS/DePAUL

1          MR. HARVIS:  Well, your Honor, our position would be

2    that there's a causal break when plaintiff then reasserts the

3    officers who have now come to actually perform the process of

4    the arrest and he says to them, "How can you arrest me?   I am

5    not trespassing.  I know people in the building."  And I think

6    that a reasonable jury could find that these officers, before

7    actually going through and arresting him, had an obligation to

8    investigate that issue.

9          THE COURT:  Really?   That the turnover officers had

10   an obligation to investigate?

11         MR. HARVIS:  I don't think that based on the facts

12   as plaintiff has laid them out that these were turnover

13   officers.

14         I think that these officers based on the fact that

15   they --

16         THE COURT:  He said nothing to them.

17         MR. HARVIS:  That's not true.  He said, once they

18   arrived, he said, "Are you guys serious?  You're going to

19   arrest me for criminal trespass, I know people in the

20   building?"

21         THE COURT:  And what would turnover officers say?

22   They either stand mute or they say yeah.

23         MR. HARVIS:  Well, no.  I mean, there's also

24   testimony that they were arguing over who was going to take

25   the collar that none of them wanted and we think that's

MARIE FOLEY, RMR, CRR